Case number 24-1139, Jason Counts v. General Motors LLC et al. Oral argument not to exceed 15 minutes for plaintiffs, 15 minutes to be shared by defendants. Garth Wotanowicz for the appellant, you may proceed. Good morning. Good morning, your honors. May it please the court, my name is Garth Wotanowicz, here representing plaintiffs today. And I'd like to begin with what I think, based on the court's question and invitation for further briefing in this case, is probably the determinative, or at least one of the determinative issues in this case, and that is the application of the Sixth Circuit's, this court's, earlier decision in Fenner to this case, and whether that decision is binding and whether this court is bound to follow it. And as our briefing outlines, I suggested that this court is bound to follow that decision. It's a recent decision by another panel of this court, and the arguments that Fenner was wrongly decided and should have been decided differently in light of the earlier decision in Ford, I think is foreclosed by the fact that there was an en banc, a petition for en banc review in that case, that the court in total rejected that petition over the objections of two of the members of this panel, in which several of the arguments that are presented for, as a basis for not following Fenner, were seen, considered, and not adopted by the court sitting as a whole. So what if we, go ahead. Well, so we should follow Fenner, including the RICO holding in Fenner? Your Honor, as we laid out in our brief, I believe the RICO holding, for different reasons, is not binding upon this panel. Is it binding for part of it, but not the other part? Yes, Your Honor, because I think the argument that we've laid out regarding the RICO holding is that there is Supreme Court precedent that was not considered by the earlier panel. Well, I mean, the argument was they didn't consider Ford correctly either, but we should ignore Fenner on one, but follow Fenner on the other? I don't think that's actually the argument that we're making, Your Honor. What we're arguing is that the binding, or at least directly applicable, Supreme Court precedent was not considered or applied by the panel in Fenner, and frankly- Assume it was out there. I mean, we have a doctrine that if there is intervening or subsequent Supreme Court authority, then perhaps a binding published panel opinion is not precedent, but it has to be a subsequent Supreme Court decision, not Supreme Court decisions were there when a panel makes a decision, and either the panel ignores the Supreme Court decision, doesn't know about it, or construes it incorrectly. I mean, that's really what our law is, is it not? Your Honor, we did cite a case in our briefing that suggests that if there is existing Supreme Court precedent that was not considered by the panel when it rendered its decision, that the court may consider that. You say not considered. You say it's not referenced in the opinion itself, but were those authorities referenced in the briefing to the court? They were not, at least not the primary authorities, which- Which ones were not addressed in the briefing? I do not believe, going off of memory, I believe that neither HEMI nor- I think that the only ones that were addressed, frankly, were Apple, were the Apple decision, and- Pardon me, Your Honor, I'm just searching for the case names. At any rate- My point is, if authority is mentioned in the briefing, why shouldn't we just assume or presume that the panel did consider that authority, even if it didn't address it in the opinion? Because, I mean, that's how we look at, like, AEDPA cases generally. We try to think about- I mean, that's just an analogy, but, I mean, why shouldn't we be looking at, deferring to earlier panel decisions, presuming that they did consider the authority if it was presented to them? I think that that's correct, Your Honor, and, again, our argument is that those authorities were not presented to or considered by that panel, and that that is the basis for considering them now. HEMI cases were not presented. Pardon me? HEMI, is that what you said? HEMI, Bridge, and there's a third one, the name of which is escaping me right at this moment. But essentially, the three primary Supreme Court cases that we presented in our briefing in this case, those arguments were not presented to that earlier panel, were not considered or referenced in the decision. And I think, and we argue that that should be considered by this panel. And I will concede, and we do concede, that if this Court doesn't believe that those are binding precedents that were not considered by that panel, then you are equally bound to follow Fenner on the RICO holding as we argue that you are on with respect to the preemption holding. So I don't think that they're inconsistent, because we are arguing that there is Supreme Court precedent that calls for a different result on the RICO holding. Well, how about if we found Supreme Court precedent that calls for a different result on the preemption finding? I mean, this is a much bigger loophole that you're advocating here for the binding effect of precedent than I was aware of us having. Your Honor, I'm not aware of any argument that defendants or anybody else has presented that there's binding Supreme Court precedent. Could be on our own motion. I mean, we find some Supreme Court cases that undermines the preemption holding. I mean, I guess if that's the test, then we're really a lot less bound than I might have thought when we came in here. I'm not saying that's right, but I'm just saying that's the implication of what you're arguing. Sure, and I don't think that it's, you know, that principle can certainly be stretched beyond reasonable bounds. And I don't think that we're arguing for some sort of freewheeling, open-ended set of reasoning here. There's a defined set of cases that we think call for a different result when you're applying, when you're looking at the standing test for RICO. We get your argument. I'm just suggesting an implication. And your argument might not end where you want it to end if that's, like, a valid way to look at precedent. I'm just suggesting. Understood, Your Honor. Anyway. Returning for a moment to the preemption issue and the effect of Fenner, I think that, you know, one of the, at least my sense was that one of the concerns expressed by at least two members of this panel with respect to applying Fenner, how Fenner applied Ford and whether those cases were in conflict was making sure that there was not set up a conflict between decisions of this court that would create havoc for both litigants and for district courts trying to apply the rule. And I would suggest that if this court decides not to follow Fenner, that it will be actually worsening that. As it stands now, Ford provides clarity for litigants with respect to the preemptive effect of EPCA on certain types of claims. Fenner, applying the same reasoning in Ford, reached a different result with a different statute, and that provides clarity for both district courts and litigants. Contrary to every district court, I think three, every district court decision that had applied Ford, and I think it was Judge Berg who said that there was no principled distinction between Ford and Fenner. So, I mean, if we're talking about upsetting district court expectations, I mean, I think that horse is out of the barn here. We had three district courts that apparently got blindsided by the decision in Fenner. With respect to, it's actually, I think it's two district courts because in counts, in this case and in Fenner, it's the same judge.  The opinions were issued on the same judge. I got blindsided twice. I'm just sort of joking.  But, you know, with respect to the district court judges, they're not the arbiters of the rulemaking here. This court and the prior panel in Fenner are the ones that create the rules that district courts and litigants are relying upon and following. And I think that for the court to have corrected that in Fenner, and if the court does something different here, there's going to be a situation where I think due to the law of the case doctrine, Fenner is going to be remanded to the district court with instructions to follow the rule in that case. That same judge would receive this case on remand with instructions to follow a different set of rules. Assuming Fenner applies, you can see that, what, two of your theories are out because Fenner followed forward as to two of your theories, and you claim that three of your theories survive. Is that right? That's correct, Your Honor. Okay. Which three theories do you say survive forward in Fenner? So those are the theories that are based on consumer expectations, and those expectations that were created in light of GM and Bosch's statements and omissions, and also on comparisons with gasoline or comparative vehicles that were not diesel and how much those polluted. That's two theories. Is that it? Well, those are the same three theories that were approved in Fenner, and I think two of them are closely related. Those are your two that you say survive. Now, the comparison with gasoline counterparts was dismissed by Judge Ludington on summary judgment grounds before the preemption rule. Is that correct? It's not plausible, for one thing. Judge Ludington has already dismissed that. Has he not? He did dismiss it on different grounds. All right. And you didn't appeal that, did you? That particular ruling, no. And you haven't argued in your brief here, have you? No, we haven't, Your Honor. All right. So that theory's out. You have to preserve issues. So you're left with consumers' expectations. And tell me, when the EPA has ruled that there is not a defeat device on this cruise vehicle, and how do you bring forward a consumer's expectation claim without attacking the EPA ruling that there is not a defeat device? Pardon me, Your Honor. With respect, I'd like to correct your characterization of what the EPA does as a rule that there is not a defeat device. The EPA does not issue a ruling at any time that there is not a defeat device in the vehicle. So it's implied, if they issue a COC, that they don't think it has a defeat device? No, Your Honor. I think that if you look at the 40 CFR 86.1848-10, which we cite in our supplemental briefing, it describes and it lays out what the effect of a COC is. It is simply a permit to manufacture vehicles that match what was disclosed to the EPA. They don't have the ability, opportunity, or even desire, I don't think, to look at every single vehicle and say, this matches. So you're arguing that you can relitigate whether there is a defeat device on these cruise vehicles? Is that your theory? No, Your Honor. But I'm just trying to clarify, the EPA has not issued a ruling that there are no defeat devices. Well, I mean, if we allowed you to proceed, would you litigate that issue or not? No, it's not necessary for our claims, Your Honor. We would be litigating the issue of whether the vehicles operated in a way that confounded consumers' reasonable expectations. What evidence do you have, other than the defeat device, as to reasonable consumers' expectations were not realized by this vehicle? Your Honor, so we have evidence regarding the function of these vehicles. I think that it's a viable claim under Fenner and under Ford because they're different types of claims, whether a reasonable consumer expects its vehicle, for example, in this case, to derate or turn off emissions in commonly experienced driving conditions at high ambient temperatures when it's cold outside. In light of the representations that GM and Bosch made, is that in line with consumer expectations? But, I mean, the idea that it's kind of like in Fenner. I mean, the idea that consumers have any walking around expectation about the nitrous oxide emissions of their vehicle under different load circumstances and temperature and so on, I mean, it just seems just utterly fictive. I mean, nobody said, well, I expected, I mean, there isn't any deposition testimony here, right, that I thought my NOx emissions were going to be thus and that it would be consistent under different loads and different demands and that, you know, I mean, you don't have anything that granular. No, and I don't think that that's required. What we have are consumers who were charged a premium for a specific emission system that was supposed to be more clean than other systems. Then what? I mean, that's always the question in these cases is, like, what's your benchmark other than the EPA standards? Because people just don't have an expectation. It's not like washing your clothes and I thought this stain was going to come out and the stain's still there. I mean, that's like a concrete expectation that, you know, a jury can measure whether it was met. I mean, here the problem is the expectation is just basically quicksand because they have no reference point because all of us lack the technical expertise to have a reference point for what it should have been based on some ad that they run on TV. Well, and I see I'm out of time, but I will. I think that's fair, Your Honor, but at the same time, think about computer programs. A consumer has an expectation that the program is going to work. They don't know how it was coded. They don't know why it might not work. And they might not have a specific idea in mind about how it should have been coded to work correctly. But if it doesn't work and they paid for it, that's contrary to their expectations. I think it's the same with emissions. I can ask one quick follow-up. I mean, what evidence do you have in this summary judgment record that the emissions that they thought, the customers actually thought the emissions were higher? Is it just the experts? Maybe I'm just making a mistake here. But is it like, you know, it would seem like the key question here is on what basis are the, could a jury find that these expectations were disappointed? Not just that they had them, but that they're disappointed. And so the customers are not, like, measuring nitrous oxide emissions. So it's not their own perception. So what is the basis on which you would persuade a jury that the emissions were higher than somehow they should have been? Sure. That's the evidence, or sorry, the record is replete with evidence in the expert report, which analyzes how the, Mr. Smithers, how the vehicles actually function and what they do, what the emission system does under certain conditions that are not uncommon. Do you have testimony by any of your plaintiffs that they knew about it, or they expected emissions to be at this level and they are disappointed that they're higher? And, I mean, do you have your plaintiffs? Yes, Your Honor. We do have testimony, and it's cited, I believe, in our supplemental brief, that regarding the consumer's expectation that because they're being charged more for this emission system, they expected it to provide cleaner emissions than would be provided in a vehicle without that emission system or in a gasoline comparator. And instead, what the proof shows is that under normal conditions, these vehicles are actually turning that system essentially off. So what they're paying for is just not working. Okay. Any further questions at this time, Judge Ketledge? Nope. Thank you, Your Honors. All right. You'll have your two minutes rebuttal. I think it was three minutes. I'm sorry. Three minutes. Good morning. Good morning, Your Honors. And may it please the Court, Jay Lefkowitz for General Motors. Counsel for Bosch is also here, but we'll only address the Court if the Court has any Bosch-specific questions. All right. I should advise Counsel that we have denied plaintiffs' motion to seal the briefs, and we have granted your motion to file a sur-reply brief. Okay. Thank you, Your Honors. I want to begin just respectfully with the question the panel asked the parties to address with respect to Rule 32.1B. And I do think the answer is yes, the rule at this point requires this Court to follow forward rather than fender, because I don't believe, as I'll explain in a minute, there's any real way to reconcile the two decisions. And with respect to the comments that Counsel made, first of all, as we know, en banc denials are not precedential, they're discretionary. And frankly, just recently in the Helfenstein case, this Court addressed this very issue. And Troese was a case where en banc was denied, and nevertheless, the Court decided to follow Brawner, for the same reason that I think the Court needs to follow forward here. In Ford, the plaintiffs argued that the defendants had manipulated the EPA-mandated fuel efficiency testing, and that the gas mileage figures that Ford reported to customers were false. And the Court said very clearly those claims are preempted under Buchman because they would permit juries to second-guess the agency's decision. In Fenner, as in counts, the plaintiffs are alleging that the defendants installed a defeat device in their vehicles that allowed them to pass the EPA's emission tests. There is no real dispute that the defeat device allegations are at the heart of the plaintiffs' case. In their summary judgment briefing, they used the term defeat device 108 times. The plaintiffs here allege that not disclosing the existence of the defeat device was a fraudulent omission. But that claim necessarily requires a jury to contradict the EPA's judgment that there wasn't a defeat device. Well, I mean, you know, you made this argument last time. I wrote what I wrote in dissent. Judge Griffin wrote what he wrote. And that's not the way it turned out. And it's a really high bar to say that you have to clear in order for us to say we're just going to disregard this precedent in F-4 because it's so wrong. And, I mean, you know, they make a valid point. It's a different statute here than it was in Ford. I mean, we know all of what you said, but that's just not the way it turned out. I would like to address that in three different respects. First of all, directly responsive to what you said, the Fenner majority purported to avoid the conflict with Ford by identifying three alternative emissions benchmarks. But the fact is, and again, as you pointed out, the through thread of all of these claims is the defeat device. Merely saying, though, that something is a consumer fraud case doesn't answer the question. Buckman, if you go back and look at the original MDL complaints in New Jersey, was framed as fraud. Fraud on the consumers. We thought we were getting a screw that was going to work in a human. We ended up with a bovine screw. You've made a misrepresentation to us. But to prove that misrepresentation, you had to run through the agency decision. Is there any material difference between the statements that were made in Fenner by alleged to have been made by GM versus the ones in here that are sort of the predicate for this fraudulent omission claim? Your Honor, I don't think that there is a material difference. Let me be clear. Let me ask you this. I've noticed that in this case there's this Puffrey ruling by the district court as to those statements, at least with respect to an affirmative misrepresentation claim. Was there a Puffrey ruling in the Fenner case? There was simply a finding by the judge that there were no affirmative misrepresentations. And that came after the ruling had been made in this case on the Puffrey? Yes, it did. Judge Ludington simply ruled in Fenner that there are no affirmative misrepresentations in the case. We're only allowing omissions theory to proceed. But what I'd like to point out is, although I don't think there is a material difference, the reality is Judge Ludington in this case very, very clearly ruled, number one, that even when read in the most generous light possible, plaintiff's complaint does not directly allege the falsity of GM's representations about the omissions level compared to prior generations. He then said plaintiffs don't hinge their claims on the cruises operations as compared to gas alternatives. Rather, they hinge them on whether GM fraudulently concealed one or more of the devices. And finally, he said you also can't find any support in the record for a clean diesel claim. He rejected that, and he said because plaintiffs are basing their claims on the alleged fraudulent defeat device. So I would say, and by the way, the plaintiffs did not appeal any one of those three rulings. They only appealed the preemption ruling. So I would say while I don't believe there's a material difference, there are different plaintiffs here. There are technically different depositions. I don't think this court is in any way bound to make the mistake that I believe the Fenner court made. The practical effect, if we were to hold that Fenner was wrongly decided, that it should have followed Ford, you would have a mandate in this case from this panel saying to ignore Fenner, but then you would have a mandate in Fenner to apply Fenner going back to the same judge at the same time. Well, I think the reality would be, number one, that this court would be making clear that when Judge Moore in the Fenner opinion said- Would you be moving in Fenner then for the court to ignore the mandate in Fenner? We would say to the trial court respectfully, and I guess I'm now telling the plaintiffs what we would say, but what we would say is three things. Number one, you've read the count's opinion, and clearly if you read Judge Moore's opinion as saying that they can put on any evidence with respect to a defeat device, then that is preempted. And in fact, Judge Moore's opinion does say plaintiffs are arguing that GM misled consumers by omitting information about how the AACD works, which by definition means that's the evidence that I think they would be putting on. I would then say in the alternative, Judge Ludington- Doesn't that hurt you if they said that in Fenner? No, because if in fact you read Fenner as saying that the evidence about the defeat device has to come into the case, then I think it is truly an irreconcilable conflict with Ford. But if we don't think it's irreconcilable, does it hurt you? No, because we will also move in that case on summary judgment and say, Your Honor, has already made a determination that there are no consumer expectations, because the record says, and it's the same as the record in this case, you know, I'm looking at the plaintiff's depositions, no expectation other than compliance with regulatory standards. By clean diesel, I mean that we expected the crews to meet the EPA requirements. And their own expert, Justin Smithers, when asked, is there any specific definition of defeat device you're relying on, he said, no, I'm relying on the federal definition of a defeat device. So we would then ask the judge to rule on summary judgment. And finally, in the alternative, we would say, but, Your Honor, if these are truly freestanding claims, if they have nothing to do with defeat device, if the only evidence the plaintiffs are going to want to do in this trial is go and measure the exhaust coming from the tailpipe and say that exhaust is higher than what we believe state law should permit and it didn't meet our expectation of satisfying state law, then we will say to the judge, we think you need to reconsider your original ruling on express preemption, which we raised below, because that would clearly be asking the jury to establish a standard for emissions. What about California, though? Wouldn't California still have an exception for that express preemption, given that it's recognized? I think in that situation, we would have to address how to deal with California, which is obviously why, Your Honor, we believe that there is no way to really reconcile Fenner with Ford. And I understand. This is a very high bar. This is not a case where Judge Moore forgot to – But your argument is that the reasoning in Fenner set up a situation of express preemption. I think the reasoning in Fenner, if you read Fenner as saying that the only evidence that can come in, contrary to the way I think I read Fenner and read Judge Moore's statements, but if you read it by saying no evidence about defeat devices, no evidence about online dosing, nothing that they actually argued in their complaint and in their briefing, and we're just going to have a test of consumer expectations divorced from any federal regulations, then I think we would have a clear preemption argument. But I would say – Wouldn't it be more prudent for us to remand and let Judge Ludington resolve these questions that you say I would raise? Since we're a court of review and we usually let the district court make the initial determinations. Would it be prudent to remand to let you make those arguments? I don't think so in the following respect. You say we don't have to because of all these other reasons, but – I don't think – look, in Fenner, the plaintiffs agreed to voluntarily dismiss their affirmative misrepresentations based on the court's rulings below. So I think there's no question that Judge Ludington understands there are no such representations, but if the mandate says you have to consider them, he'll look at the evidence again, and I believe, or I certainly hope, that he would say they're unfounded and there's no basis. But I think in counts, the court, this court respectfully, should render a decision, and I think the decision is very clear. Number one, if, as I believe based on your prior writings, you agree that fundamentally this case is about the defeat device and whether or not GM did something with its AECDs that was not in compliance with law and therefore the consumers were somehow misled, that fundamentally, every bit as much as the fraud in Buckman and in Ford, that does run up against square conflict preemption, and I think it's incumbent upon the court to say that. The court could say that with respect to counts and still say, look, to the extent that Ford, that Fenner somehow, actually only was carving out misrepresentation claims that had nothing to do with... That's the only way I can read Fenner and say that it is, that we have to follow it. I mean, if it actually concerns the defeat device, I would say that it is in direct conflict with a prior decision and that we have to disregard it totally and Ford controls. So the only way I would follow Fenner is to have a narrow reading, just like you said, and I don't think the evidence supported that in Fenner, and I think we wrote about that, but the argument is that somehow the evidence supports it here, and I don't think it does, but I feel more comfortable to have a ruling by Judge Ludington on that issue. Well, I think you could issue your ruling and say what you believe to be the case about what is in Fenner. We're going to rule. Right, but Judge... Not to believe, but we're actually going to make a rule. We're not writing any more Fenner opinions. No, I understand. No, I'm saying you should write the opinion here. I think Judge Ludington will read the opinion and understand what his obligation is to do on remand, and we will give him a variety of options. The last thing I'd like to say, very, very briefly, because I don't think the Court's particularly interested in, in the Sixth Circuit we believe the Trollinger rule applies. Apple made clear that this is an absolute bright-line test, and no circuit has ever said that the indirect purchase rule doesn't apply in a RICO context, and all of the cases that they raised are dealing with proximate cause issues, not the indirect purchaser rule. I have one fact then. Oh, go ahead. Mr. Lefkowitz, if I may ask you, can you compare for me or describe for me the disclosure of the device in this case for this vehicle as compared to the disclosure in Fenner? Like in Fenner, the very device that was called a defeat device was disclosed, they had meetings, it was a couple hundred pages. Can you describe that? Yes. It is the same process that GM has to go through with the agency with respect to all of its vehicles, and it is an elaborate process. And, in fact, the certificate of compliance is not just a statement that says, oh, we here certify that whatever GM submitted is in the vehicle. It is a certificate that says they are compliant with the law. So, frankly, to the extent that the Fenner opinions try to suggest there might be some difference with Ford because in Ford the EPA was publishing a standard and here it's just GM making a statement, this is the EPA making a different type of a statement. It stamps COC, certificate of compliance, on every engine block. Well, then, I mean, what is your response to the plaintiff's argument in their briefing and also this morning that General Motors was, in essence, building a different vehicle than the one described in the COC? I think it's a challenge to the EPA's determination that we complied fully with the law with respect to our emissions because we provided them with all of the information. It's like a drug company, you know, when it's applying for an NDA. It has to provide all of the information, all the testing, all the data that it's aware of, and then the EPA, in this case, makes a determination either to award the certificate of compliance or not. And if it doesn't, it can't sell the vehicle. Okay. Thank you. Thank you, Your Honors. All right. Let's hear from Defendant Bosch. Oh, well, that was only if we had questions. But go ahead. Oh. Well, no. Well, you can go. No, you're right. I'm sorry. You're right. Good morning, Your Honor. Patrick Schweiber on behalf of Robert Bosch, LLC. May it please the Court. I'll just add one point from Bosch's perspective to the argument that counsel for GM made, and that goes back to something that plaintiff's counsel said, that to the extent this Court follows Finner and to the extent this Court thinks that a false advertising claim could go forward in light of Finner, there's simply no basis on this record in this case to support a claim against Bosch, LLC based on advertising. Plaintiff's counsel referenced representations that Bosch made. There's nothing in the record to that effect that any of the consumer plaintiffs here ever heard anything or certainly ever relied on anything as to Bosch, LLC. In fact, all but one plaintiff didn't even know that there were Bosch, LLC parts in his car when he purchased it, and the one who did know didn't care. So to the extent this case is moving... Patrick, if we do allow a claim to go forward against Bosch, then are you in agreement that we should be looking at whether or not you had a settlement? No, Your Honor. We think that Judge Ludington made the right decision on the settlement issue, namely that... Bosch is backing away from the settlement at this point. Well, Your Honor, we think that there was no motion pending at the time that Judge Ludington dismissed the case, and we think there's no basis to find that he abused his discretion in that regard. By the time he dismissed the case, the motion to... or whatever it was about the settlement had been denied, right? Pending further briefing or... Judge Ludington wanted more information. So at the time the case was dismissed on preemption grounds, the settlement had been denied at that point, right? That's absolutely correct, Judge Griffin. So what happened was there was a motion for preliminary approval. Judge Ludington denied that unambiguously in bold capital letters, denied, and he called for supplemental briefing. The party submitted the supplemental briefing, but there was never a renewed motion by the time that the case was dismissed. Now, the plaintiffs argue here, well, the motion was effectively pending. We did the supplemental briefing. Effectively pending, it either was pending or it was not, and Judge Ludington was correct and certainly did not abuse his discretion in finding it was not. It would be a bad rule to follow the route the plaintiffs suggest here to say that, oh, before a district court dismisses a case, he needs to hunt around in the record to find things that are, quote, there's no basis for this court to find that Judge Ludington abused his discretion in saying no motion, nothing for me to decide, I can dismiss the case without further action. Unless there's any further questions. Thank you, Your Honors. All right. All right, three minutes rebuttal. I have just a couple of additional points to make. GM's counsel brought up and discussed in prompting by your question whether the devices were disclosed and what the circumstances were regarding their disclosure. And this refers to these AECD documents, which are given to the EPA, and that describe the systems that are in place to control emissions in the vehicle. Those are reviewed and then a COC is issued. And he described this as it's a back-and-forth process. There's lots of details. There's lots of exchanges. All of that is true, and it's completely an issue of fact whether the devices or the functions that we're describing that increase emissions in these vehicles were, in fact, disclosed to the EPA. They are alleging and they are assuming that those were, in fact, disclosed. That is not established. You're referring to the Ford case, aren't you? That Ford gave them supposedly fraudulent mileage estimates, and they cooked the numbers, and, I mean, you're getting fraud on the agency here. No, I don't think so, Your Honor, because, again, it goes back to the definition of what the COC is and what it does. The COC is a permission to manufacture vehicles that are made in compliance with what was disclosed. If they, in fact, made the – if those things were all disclosed and they can show that it was disclosed and these vehicles were built in accordance with the COC, we're done. That is conceded. But we are saying that these systems that they put in place were not in there. No, but you're talking fraud on the agency. Yeah, and didn't they have an obligation under the statute if they did manufacture differently than the COCs, then to amend or let the agency know about those changes? Your Honor, what they had a permission to do was to manufacture those vehicles in accordance with the COC. They had a regulatory obligation to let the EPA know that they changed it, didn't they? I'm not sure that that's true, Your Honor. And that's fraud in and of itself. Surely if it's doing what you allege, they had an obligation to tell the agency that. They may have, Your Honor. I haven't seen that argument made, and I haven't seen the particular statute, but I don't think that that requires fraud on the EPA. I'm sorry? I don't think that that requires fraud on the EPA. They are building something else entirely different. I mean, if it's fraud on the consumers not to disclose this stuff, it's pretty hard to see how it's not fraud on the EPA not to disclose the same stuff. I would imagine the EPA would be even more indignant, given that it's precisely their mission in life to review this before they issue a COC. Well, if we look at Ford, the problem in Ford was that the attacks on the mileage estimates, the fuel economy estimates, specifically attacked the figures that were adopted and published by the EPA. In this case, the COC is not under attack. GM and Bosch could have manufactured all of the cars they wanted that were in compliance and had all of the characteristics that were disclosed to get the COC. I understand your argument. I mean, I think it's a pretty clear implication when they issue a COC that it doesn't contain a device that is going to radically increase emissions in real-world conditions. I mean, it's just, you know, it's hard. It's very hard to understand how they would approve this if they knew it was doing what you say. Certainly, it implies that there was not something in the disclosures that significantly reduced the emissions effectiveness in real-world conditions. Is there a material difference between the disclosures in the Fenner case as to the device there and the disclosures in this case as to the device in the Cruz? There is actually a material difference. In Fenner, the only emissions-increasing device involved was what's known as online dosing, and it's this particular function that reduces it under certain circumstances. Here, there were also devices that sort of interrupted the emissions control process based on ambient temperatures. And there was also some monkeying around, for lack of a better term, with the way that they measured external temperatures that resulted in additionally increased emissions. You don't think those features were disclosed to the EPA? No, Your Honor, they were not. That is what we allege. That's what we think the evidence shows. One just point of clarification. You asked about the RICO cases that were cited in Fenner, and the three that I was referring to that were not cited or discussed in Fenner were Holmes, Onza, and Hemigroup. All right. Any further questions?  Thank you, Your Honor. Thank you, Counsel. The case will be submitted.